STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

23-254

SUCCESSION OF DOROTHY TERRELL MOUTON

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 46,166
HONORABLE PATRICIA KOCH, DISTRICT JUDGE

**********

JONATHAN W. PERRY
JUDGE

**********

Court composed of Van H. Kyzar, Jonathan W. Perry, and Charles G. Fitzgerald, Judges.

MOTION TO STRIKE GRANTED; JUDGMENT AFFIRMED, IN PART; PEREMPTORY EXCEPTION OF NO RIGHT OF ACTION ENTERED, AND THE JUDGMENT IS REVERSED, IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS.

.

Brian K. Thompson
Thompson Law Firm, LLC
3600 Jackson Street, Suite 198
Alexandria, Louisiana 71303
(318) 473-0052
**COUNSEL FOR APPELLANTS/CROSS-APPELLEES:**
    Thomas and Donna Doyle


Elwood H. Keim, Jr.
Attorney at Law
11863 Market Place Avenue
Baton Rouge, Louisiana 70816
(225) 610-6519
**COUNSEL FOR APPELLEES/CROSS-APPELLANTS:**
    Rene Mouton, Jr. and Lawrence Mouton

**PERRY, Judge.**

This succession matter is before the court on appeal by Thomas Doyle ("Thomas") and Donna Doyle ("Donna") (collectively, "the Doyles"), the neighbors and caretakers of Dorothy Terrell Mouton ("Dorothy"). In their appeal, the Doyles challenge the trial court's judgment which nullified two of Dorothy's testaments for undue influence and have filed a motion to strike statements in the appellees' brief in support of their answer to the appeal. For the following reasons, we grant the Doyles's motion to strike, affirm the trial court judgment relative to its nullification of the testaments, and reverse that part of the judgment which ordered the Doyles to restore Dorothy's bank account balances to that which existed prior to her death.

## FACTS AND PROCEDURAL HISTORY

Dorothy was born on November 15, 1930, and died on September 28, 2021. At the time of her death, she had been widowed since February 26, 1996, having been married to Rene Paul Mouton, Sr. Dorothy did not have any biological children, but she was the stepmother of Rene Paul Mouton, Jr. ("Rene") and Lawrence Keith Mouton ("Larry") (collectively "the Moutons"). After her husband died, Dorothy lived for some time in Calcasieu Parish. Around 2002, Dorothy returned to Glenmora, her hometown located in Rapides Parish.

After moving to Glenmora, Dorothy lived next door to the Doyles and their minor child, Mycah. The Doyles testified that they had a close relationship to Dorothy and described her as being almost like a grandmother to Donna, as well as Mycah. Thomas, who was the Chief of Police for Glenmora at the time, started assisting Dorothy with her chores, grass cutting, home repairs and maintenance, among other things. Although Dorothy wanted to pay him for his work, his help, and assistance, he refused. Later, after seeking advice from the attorney for the town of Glenmora and being informed that there would be no ethics violation as long as

he performed work for Dorothy, Thomas began accepting payment and other compensation from Dorothy for his work on her behalf.

After her husband died, Dorothy executed a statutory will on April 22, 1996. In that testament, Dorothy bequeathed $100,000 to her sister Catherine G. Terrell ("Catherine"), who lived in Tennessee and the remainder of her estate was bequeathed equally to the Moutons.

After Catherine died, Dorothy asked Thomas to recommend an attorney to draft and execute a new will; Thomas recommended Scott Brame ("Mr. Brame"), an Alexandria lawyer, who met with Dorothy. On January 31, 2018, Dorothy executed a statutory will. In that testament, Dorothy made the following bequests: (1) a conjoint legacy to the Doyles of her home and property in Glenmora; (2) a conjoint legacy to the Doyles of the money in her two Sabine Bank accounts, together with her automobile, as well all tools, property, equipment, and movable property situated on her Glenmora property; (3) a conjoint legacy to the Moutons of all monies in her Merrill Lynch account; (4) a legacy to Rene of all monies in her Whitney Bank account; (5) her cats and cat furnishings were bequeathed to Mycah; and (6) to Elizabeth Mancil ("Ms. Mancil") she left all her furnishings located in her Glenmora home. The 2018 testament also contained a universal bequest "to Thomas R. Doyle and Rene Paul Mouton, Jr., and Lawrence 'Larry' Mouton, as a conjoint legacy, the balance of my estate, including any lapsed legacies, if any." Additionally, Dorothy named the Doyles as co-independent executors of her estate.

Later, Dorothy wanted to slightly amend her 2018 will and an appointment was made with Mr. Brame. On February 18, 2020, Dorothy signed an amended will. At that time, she confirmed the appointment of the Doyles as co-independent executors as well as the bequests made in the 2018 testament with one exception—the earlier-made bequest of her home furnishing to Ms. Mancil was deleted.

On December 30, 2021, the Moutons filed a petition to open Dorothy's succession. They also filed a motion and order for rule directed to the Doyles to show cause why Dorothy's 2020 will[1] should not be declared invalid because of lack of capacity and undue influence. Additionally, the Moutons sought to revive and probate Dorothy's 1996 will, freeze the assets of Dorothy's estate, and establish administration of the succession. Thereafter, on February 20, 2022, the Doyles petitioned the court to probate and execute Dorothy's 2020 testament and sought confirmation of their appointment as co-independent executors.

After conducting an evidentiary hearing on June 1, 2022, taking the matter under advisement, and handing down written reasons, the trial court signed a judgment on October 13, 2022, decreeing that: (1) Dorothy possessed testamentary capacity at the time she executed the testaments in 2018 and 2020; (2) the Moutons showed by a preponderance of the evidence that Dorothy's testaments of 2018 and 2020 were the product of undue influence by the Doyles and were declared invalid as a produce of undue influence; (3) the Doyles were cast with costs of the litigation; (4) all the assets of Dorothy's estate be frozen until a complete administration of the succession is completed; (5) all bank accounts that had been signed over to the Doyles should be restored to their previous balances prior to Dorothy's death; and (6) the request of the Doyles to be named as co-independent testamentary executors

---

[1] Although Dorothy's earlier 2018 will was not mentioned in the petition, the 2018 will was entered into evidence, addressed in the hearing, and referenced in the trial court's written reasons for judgment and its judgment. Louisiana Code of Civil Procedure Article 1154 states, in pertinent part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues.

None of the parties to this case have raised this as an issue.

of Dorothy's estate be denied. In a separate document dated October 13, 2022, the trial court ordered Dorothy's last will and testament dated April 22, 1996, probated and appointed the Moutons as co-independent executors.

Subsequently, the Doyles devolutively appealed and the Moutons answered the appeal. In response to the Moutons' answer to the appeal, the Doyles filed a motion to strike a factual statement in their brief which asserts that "since the hearing in this matter, appellees, carrying out their duty as executors, discovered additional bank accounts from which the Doyles withdrew additional funds."

## APPELLANTS' ASSIGNMENTS OF ERROR

A. The District Court erred, as a matter of law, in its ruling of undue influence over [Dorothy] by [the Doyles] based upon hearsay statements attributed to [Dorothy] by the witnesses.

B. The District Court erred, as a matter of law, by applying the wrong burden of proof to the allegations by requiring the lower preponderance of the evidence as opposed to the higher clear and convincing burden under Louisiana law.

C. The District Court erred, as a matter of law, by finding that the 2018 and 2020 testaments were a product of undue influence by the Appellants at the time of signing.

## MOTION TO STRIKE

The Doyles have filed a motion to strike factual statements in the Moutons' brief that were not made at the trial of this matter and are not supported by any evidence in the appellate record.

"The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal." La.Code Civ.P. art. 2164. As such, appellate courts are bound by the evidence that may be found in the record and cannot receive new evidence. *Denoux v. Vessel Mgmt. Servs. Inc.*, 07-2143 (La. 5/21/08), 983 So.2d 84. Evidence not formally introduced at trial may not be considered by the appellate

court. *O'Connor v. Grove Homeowners Ass'n*, 19-676 (La.App. 3 Cir. 4/22/20), 297 So.3d 1018, *writs denied*, 20-593, 20-592 (La. 9/23/20), 301 So.3d 1187, 1188.

In the present case, the Moutons' own words in their appellate brief show that the referenced facts were not made at the hearing in the trial court and are not contained in the appellate record. Therefore, we grant the Doyles's motion to strike this factual allegation and we will not consider these alleged facts in addressing this appeal.

## APPELLEES' ANSWER TO THE APPEAL

In their answer to the appeal, the Moutons assert that the trial court erred in failing to enter judgment requiring the Doyles to return funds taken by them from the bank accounts of decedent prior to her death. We will address that issue later in this opinion.

Additionally, as part of their argument in support of their answer to the appeal, the Moutons argue in their brief that the trial court erred in finding Dorothy had testamentary capacity when she executed her 2018 and 2020 testaments. Because a reversal of this aspect of the judgment on this ground would avoid the need to address the Doyles's assignments of error, we will first address the Moutons' argument in brief.

## APPELLATE PRACTICE: THE ANSWER TO THE APPEAL

## THE MOUTONS' ARGUMENT

In their brief to this court, the Moutons argue that "there is no possible reading of the evidence which justifies admitting either the 2018 or 2020 testament to probate" because Dorothy was not sufficiently sound of mind to fully understand the nature of the wills and their effects. As such, the Moutons urge that the trial court judgment which held otherwise should be reversed.

5

## THE DOYLES'S POSITION

The Doyles contend there is no manifest error in the trial court's determination that Dorothy was sufficiently sound of mind to execute the 2018 and 2020 testaments.

## LAW AND DISCUSSION

In *Bernard v. BFI Waste Service, LLC*, 20-636, pp. 5–7 (La.App. 3 Cir. 7/21/21), 325 So.3d 415, 422–23, (footnotes omitted), *writ denied*, 21-1271 (La. 11/17/21), 327 So.3d 995, we observed:

> Louisiana Code of Civil Procedure Article 2133(A) provides, in pertinent part:
>
>> An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer.
>
> Essentially, an "answer to an appeal" is itself an appeal, except that the answer must specifically state the relief requested, while an appeal usually seeks review of all parts of the judgment. *State ex rel. Guste v. Pickering*, 365 So.2d 943 (La.App. 4 Cir.), *writ denied*, 366 So.2d 556 (La.1978); *see also Grady v. Alfonso*, 315 So.2d 832 (La.App. 4 Cir. 1975).
>
>> Generally, an answer to an appeal operates as an appeal only of those parts of the judgment complained about in the answer. *Liedtke v. Allstate Ins. Co.*, 405 So.2d 859 (La.App. 3 Cir.), *writ denied*, 407 So.2d 748 (La.1981); *City Savings Bank & Trust Co. v. Johnson*, 286 So.2d 131 (La.App. 3 Cir. 1973). However, the courts often interpret statements in an answer liberally to cover issues the appellee contests in view of the public policy favoring appeals. *Liedtke*, 405 So.2d 859.
>
> Steven R. Plotkin, Louisiana Civil Procedure, Art.2133, § 1.
>
> In *Liedtke*, Judge Stoker, writing for this court, stated that the language in an answer to an appeal should be given a broad and liberal

6

construction rather than a restrictive one. As reflected in *Liedtke*, 405 So.2d at 870, the defendants answered the plaintiffs appeal stating, "[t]hat they are aggrieved by the finding of liability and the award of damages in the above-described judgment." Addressing that language, the *Liedtke* court ruled that this was sufficient to raise the question of whether the contributory negligence of the minor son of the plaintiff father (Liedtke) barred the recovery by the father of the minor son's medical expenses for which the answering defendants had been held responsible, i.e., the general reference in the *Liedtke* answer to liability and damages was sufficient to raise those issues generally. *See also Clark v. Schwegmann Giant Supermarket*, 96-2301 (La.App. 4 Cir. 1/13/99), 740 So.2d 137.

In the present case, we have reviewed the language of the Moutons' answer to the appeal. Based upon *Liedtke* and other like jurisprudence, we find the Moutons failed to complain in their answer to the appeal about the trial court's ruling which found Dorothy was sufficiently sound of mind to execute the 2018 and 2020 testaments. *See also Direct Tech Drilling, LLC v. Danrik Constr., Inc.*, 17-324 (La.App. 3 Cir. 11/22/17), 235 So.3d 1173, *writ denied*, 18-459 (La. 5/11/18), 242 So.3d 568. Although the Moutons discussed this issue *in brief*, their failure to state this issue and seek relief *in their answer* precludes us from addressing their argument. Accordingly, the trial court's judgment on this issue is final.

## THE 2018 AND 2020 TESTAMENTS—UNDUE INFLUENCE; HEARSAY

## AND BURDEN OF PROOF

## APPELLANTS' ARGUMENTS

First, the Doyles argue the trial court erred as a matter of law when it ruled that the allegations of undue influence only need be proven by a preponderance of the evidence, not the higher burden of clear and convincing evidence as dictated in La.Civ.Code art. 1483.

The Doyles point out that although Dorothy had granted them a Medical Power of Attorney, there was no showing made by the Moutons that, at the time the donation was made or the testament executed, there was a relationship of confidence

7

at the time of signing the 2018 and 2020 testaments sufficient to lower the burden of their proof to a preponderance of the evidence.

Secondly, the Doyles contend the trial court abandoned its position of "gatekeeper" when it allowed hearsay statements from the witnesses who simply recited their version of Dorothy's state of mind as a fact because she was deceased. They argue that every witness called by the Moutons was allowed to testify about hearsay statements allegedly made by Dorothy relating to: (a) her treatment by the Doyles and (b) her fear of being placed in a nursing home, among other things. They argue that trial counsel repeatedly objected to the hearsay statements. They further assert that after the trial court allowed this testimony, counsel for the Doyles entered a continuing objection on the grounds of hearsay. They contend that instead of allowing the hearsay, the trial court should have applied La.Code Evid. art. 804 to analyze if there were exceptions to the hearsay rule. *See Succession of Knighton v. Knighton*, 13-56 (La.App. 3 Cir. 1/15/14) (unpublished opinion).

## APPELLEES' POSITION

Relying on La.Civ.Code art. 1483, the Moutons contend that there is no merit to the Doyles's contention that the relationship of confidence can only exist by a person having professional qualifications to call the lesser burden of proof into play. Even if that might be true, Thomas, in particular, met that definition when (a) he undertook responsibility for managing Dorothy's financial affairs; (b) Thomas was the Glenmora chief of police between 2002 and January 2022, during which time he assumed the management of Dorothy's finances; and (c) according to the Moutons' testimony, Dorothy gave extra weight to Thomas's opinions and pronouncements because he was in law enforcement. Accordingly, the Moutons contend the trial court properly applied the preponderance of evidence standard to the proof of undue influence.

The Moutons next contend the Doyles's hearsay arguments are not properly before the appellate court. They argue that the Doyles failed to make contemporaneous objections to allegedly inadmissible evidence. Furthermore, they argue that if the Doyles made a continuing objection, it was insufficient to preserve the objection for appellate review.

Regarding the continuing objection, the Moutons assert that the objecting party must precisely define the objectionable line of questioning. Applying that test to the present case, the Moutons point out that: (1) at the time the Doyles attempted to make a continuing objection, the trial court had not yet overruled any of their hearsay objections; (2) the Doyles merely objected to "hearsay" without identifying a specific line of questioning to which they wished to object even though hearsay is often admissible under La.Code Evid. art. 804 and a generalized objection does not assist the court in reaching a correct ruling on the objection; and (3) at no time did the Doyles secure the trial court's permission to rely on a continuing objection.

The Moutons group most of the hearsay statements into two groups:

(A) Dorothy's statements to Claudia Johnson ("Mrs. Johnson") about her decision to leave property to the Doyles to avoid being placed in a nursing home by the Doyles. These statements are admissible under La.Code Evid. art. 803(3) because those statements show Dorothy's perception that the Doyles were too controlling, and she wanted to get away from them.

(B) The other hearsay statements made by a variety of witnesses may be inadmissible. Nonetheless, the Doyles failed to object to them or they failed to ask that the statements be stricken. In such a case, "[w]hen inadmissible hearsay evidence is admitted without objection[,] it may be considered and given the substantive weight to which it is entitled." *Carpenter v. Guillory Inv., Inc.*, 18–571, p.1, no.1 (La.App. 3 Cir. 2/27/19), 266 So.3d 581, 583, *writ denied*, 19–748 (La. 9/17/19), 279 So.3d 384.

## LAW AND DISCUSSION

*Undue Influence: The burden of proof*

From the outset, we must determine if, as alleged by the Doyles, the trial court legally erred when it applied the preponderance of the evidence burden of proof instead of the clear and convincing test when it evaluated the proof of undue influence.

Louisiana Civil Code Article 1483 provides:

A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence.

In the present case, the record shows that the Doyles, persons who were not related to Dorothy (the donor/decedent) by affinity, consanguinity or adoption, involved themselves in Dorothy's financial affairs and served as caretakers of sorts for several years. As reflected in the jurisprudence, that alone has been found to be a "relationship of confidence." *See Succession of Dopp*, 21-193 (La.App. 1 Cir. 10/18/21), 331 So.3d 949 (holding that a relationship of confidence existed when the ex-wife of the decedent involved herself in his affairs and served as a caretaker of sorts for him, at least for a period of time); *Kinney v. Bourgeois*, 06-2384 (La.App. 1 Cir. 9/14/07), 2007 WL 268113 (unpublished opinion), *writ denied*, 07-2026 (La. 1/7/08), 973 So.2d 730 (finding that a "relationship of confidence" existed between the decedent and her hairdresser, who briefly assisted her by looking after her affairs and taking care of her); *Succession of Braud*, 94-668 (La.App. 4 Cir. 11/17/94), 646 So.2d 1168, *writ denied*, 95-383 (La. 3/30/95), 651 So.2d 841 (finding that a preponderance of the evidence was the applicable burden of proving undue influence

when a "relationship of confidence" existed between the decedent and her caretaker, who were otherwise not related).  After reviewing the record, it is abundantly clear that Dorothy placed her trust and confidence in the Doyles, particularly Thomas because he was the chief of police.  Thus, we find the trial court properly concluded that "a relationship of confidence"[2] existed between the Doyles and Dorothy such that undue influence need only be established by a preponderance of the evidence.

### *Undue Influence: The Hearsay Argument*

In their argument to this court, the Doyles contend the trial court repeatedly allowed hearsay testimony under the mistaken position that any witness could testify about what Dorothy said because she was deceased.  They argue that as gatekeeper, the trial court erred when it simply stated that an exception to the hearsay rule is created when a person is deceased and, thus, is unavailable as defined in La.Code Evid. art. 804(A)(4).  Therefore, they contend that such witness testimony provided the trial court with information of statements allegedly made by Dorothy about her treatment by the Doyles and her fear of being placed into a nursing home.

In response to the Doyles's argument, the Moutons assert that the Doyles failed to make contemporaneous objections to alleged hearsay testimony and did not make a sufficient continuing objection to such testimony.

### *Hearsay: The Law and Analysis*

Louisiana Code of Evidence Article 103 provides, in pertinent part:

---

[2] In *Bunge Corp. v. GATX Corp.*, 557 So.2d 1376, 1384, n. 4 (La.1990), the court explained in general the legal concept of a confidential relationship:

> The confidential relationship is not restricted to any specific association of the parties.  While the most frequent illustrations are those of trustee and beneficiary, attorney and client, parent and child, or husband and wife, the term also embraces partners and co-partners, principal and agent, master and servant, physician and patient, "and generally all persons who are associated by any relation of trust and confidence."  *Appeal of Darlington*, 147 Pa. 624, 23 A. 1046, 1047 (1892).

**A. Effect of erroneous ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

    **(1) Ruling admitting evidence.** When the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection; or

    **(2) Ruling excluding evidence.** When the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel.

Addressing the purpose of the contemporaneous objection rule, the supreme court stated in *Trascher v. Territo*, 11-2093, p. 4 (La. 5/8/12), 89 So.3d 357, 362, that "[a] party may not complain on appeal about an evidentiary ruling in the trial court unless the trial judge was given the opportunity to avoid the perceived error, and the ruling 'affected' a 'substantial right' of the party."

In *Bayou Bridge Pipeline, LLC v. 38.00 Acres*, 19-565, pp. 22–23 (La.App. 3 Cir. 7/15/20), 304 So.3d 529, 545, *writ granted*, 20-1017 (La. 12/8/29), 305 So.3d 865, *aff'd on other grounds*, 20-1017 (La. 5/13/21), 320 So.3d 1054, we stated:

> The trial court is vested with vast discretion in connection with the admissibility of evidence. *Bridgers v. Southwest Louisiana Hosp. Ass'n*, 99-520 (La.App. 3 Cir. 11/3/99), 746 So.2d 731, *writ denied*, 99-3402 (La. 2/18/00), 754 So.2d 965. It will not be reversed absent an abuse of that discretion. *Maddox v. Omni Drilling Corp.*, 96-1673 (La.App. 3 Cir. 8/6/97), 698 So.2d 1022, *writs denied*, 97-2766, 97-2767 (La. 1/30/98), 709 So.2d 706.

In the present case, the Doyles draw our attention to multiple hearsay objections they made as well as the continuing objection they raised.

Our review of the record shows the trial court granted multiple hearsay objections raised by the Doyles; *see, e.g.*, Rene speaking about what Merrill Lynch personnel told him, as well as what the lady at Sabine Bank said about Dorothy's conversation with her.

On the other hand, the record reflects the following testimony when counsel for the Moutons was questioning Rene:

Q     Okay. So until that time had Mr. Doyle or Mrs. Doyle taken any money for what you're proposing is the care of [Dorothy], had they been taking any money from her for her care or were they just doing it voluntarily?

A     I can tell you what she told me, but you don't want to hear what she told me.

Q     No. My question is, you're proposing for the first time to pay Mr. Doyle and he refused.

A     Correct.

Q     Okay

BY THE COURT:

So wait, I think some clarification [is needed] . . . [Y]ou can tell me what [Dorothy] said. She's the decedent. You can't tell me like what Dr. Slaughter said or what the elder affairs person, someone that could be called as a witness. That's different.

A     Dorothy told me that when I – when I proposed the salary, she said I give [Thomas Doyle] money from time to time for helping me.

It was at this point when the trial court, on its own initiative and without objection by the Doyles, expressed its understanding of the exception to the hearsay that the question of hearsay pivoted from the more generic understanding of hearsay to the more minute exceptions to the hearsay rule, i.e., the unavailability of the declarant because of death. It was at this time when counsel for the Doyles should have raised an evidentiary complaint to the trial court's pronouncement and stated the specific ground for the objection to the trial court's appreciation of the hearsay rule in question—no such objection was made by the Doyles. Had an objection, complete with the grounds for the argument, been made at this juncture, the trial court could have been given the opportunity to reassess its understanding of the hearsay objection and the applicable exceptions to that rule of evidence. Instead, the

record shows an absence of objection by the Doyles to the trial court's appreciation of what it considered was permissible hearsay.

In making this determination, we recognize that a trial court has a duty to function as a gatekeeper when the introduction of testimony is in question. Nonetheless, it is also true that statutory law and jurisprudence create a corresponding and threshold duty on the objecting party to first call the alleged evidentiary objection to the attention of the trial court. *Trascher*, 89 So.3d 357; La.Code Evid. art. 103(A); *see also* La.Code Civ.P. art. 1635. Accordingly, it was at this point that this ruling of the trial court set the stage for later similar testimony— testimony the Doyles now contend was improper. We find that the Doyles failed to raise an objection at this juncture or at any later point when similar testimony was offered. Therefore, we find the Doyles have not preserved this issue for appellate review.[3]

### Undue Influence: the Law

Louisiana Civil Code Article 1479 provides:

> A donation *inter vivos* or *mortis causa* shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.

With regard to the type of influence that would result in the invalidity of a donation contemplated, Comment (b) of La.Civ.Code art. 1479 states, in pertinent part:

> [T]he objective aspects of undue influence are generally veiled in secrecy, and the proof of undue influence is either largely or entirely circumstantial.... [E]veryone is more or less swayed by associations

---

[3] Because of our resolution of this issue on this ground, we do not need to reach the issue of whether the Doyles's later continuing objection preserved the issue for appellate review. However, we point out that when the Doyles purportedly entered their continuing hearsay objection, it was the trial court, not the Doyles, who first interjected concerns about Thomas's double hearsay testimony and cautioned the witness about saying what Dorothy told personnel at Regions Bank and what the bank personnel told her about what would happen to the money in the account once she died. At that time, the record shows the trial court stated, "We're getting so much hearsay that nobody seems to object to." It was only after hearing the trial court's comments that trial counsel for the Doyles made a general "continuing objection" without addressing a particular hearsay statement and without stating any ground for the objection.

with other persons, so this Article attempts to describe the kind of influence that would cause the invalidity of a gift or disposition. Physical coercion and duress clearly fall within the proscription of the previous Article. The more subtle influences, such as creating resentment toward a natural object of a testator's bounty by false statements, may constitute the kind of influence that is reprobated by this Article, but will still call for evaluation by the trier of fact. Since the ways of influencing another person are infinite, the definition given in this Article is used in an attempt to place a limit on the kind of influence that is deemed offensive. Mere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else's volition for his own.

As we determined earlier, the trial court did not err in finding that the Moutons only had to show by a preponderance of evidence that Dorothy's wills were the result of undue influence on the part of the Doyles. "Proof by a preponderance of the evidence means that the evidence, taken as a whole, shows that the fact or cause sought to be proven is more probable than not." *Crowell v. City of Alexandria Through Snyder*, 558 So.2d 216, 218 (La.1990). A trial court's finding of undue influence is fact intensive and cannot be disturbed on appeal in the absence of manifest error. *Allen v. Edmond*, 18-1151 (La.App. 1 Cir. 5/14/19), 277 So.3d 359. Under the manifest error standard of review, a reviewing court may not merely decide if it would have found the facts of the case differently. *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592 (La. 12/8/15), 193 So.3d 1110. Rather, to reverse a trial court's factual conclusion, the appellate court must find no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. *Hayes Fund*, 193 So.3d 1110. Thus, the issue before us is whether the trial court manifestly erred when it concluded that the Moutons proved, by a preponderance of evidence, that Dorothy's 2018 and 2020 testaments were void due to the Doyles's undue influence.

In *Succession of Dean*, 17-155, pp. 8–9 (La.App. 1 Cir. 3/29/18), 247 So.3d 746, 753, *writ denied*, 18-679 (La.9/14/18), 252 So.3d 479), the court stated:

The influence may be exerted by the donee himself or by a third person, even under circumstances where the donee takes no part in the activities and may be unaware of them, as long as some person exercises control over the donor, presumably one who is interested in the fortunes of the donee. *See* La. Civ. Code art. 1479, Revision Comment (c); *Succession of Himel v. Todd*, 11-1638 2012 WL 2921495, p. 4 (La.App. 1 Cir. 7/17/12), *writ denied*, 12-1878 (La. 11/9/12), 100 So.3d 839. While the influence must be operative at the time of the execution of the donation or testament, it is not necessary the acts themselves be done at that time, or the person exercising the pressure be present then. *See* La.Civ. Code art. 1479, Revision Comment (d); *Succession of Himel*, 2012 WL 2921495 at p. 4.

## APPELLANTS' ARGUMENT

The Doyles contend the record was absent of any evidence of their undue influence over Dorothy at the time the 2018 and 2020 wills were executed. They point out that at that time, Dorothy was living on her own, driving herself, taking care of herself, attending church activities, and was volunteering at the Senior Citizens Center. Exemplifying that lack of undue influence, they further point out that Dorothy showed her independence when the Moutons sought to be placed on her bank accounts—at that time, she simply refused their request. Thus, they argue that none of this is indicative of a person subject to undue influence.

In that regard, the Doyles further point out that when Dorothy signed the 2018 and 2020 testaments, she did not solely include bequests to them. To the contrary, they highlight that the Moutons were still included in the 2018 and 2020 wills. Accordingly, the Doyles argue that if someone wanted to take advantage of an elderly person, they would have forced them to give the influencers the entirety of the estate. Dorothy did not do that.

## APPELLEES' POSITION

The Moutons contend the trial court did not commit manifest error when it found the 2018 and 2020 testaments were void due to undue influence. Initially, they point out that Dorothy's dementia made her especially vulnerable to such

16

influence. They further argue that when Thomas became involved in Dorothy's financial matters, he assumed a fiduciary duty to her, and he breached that duty every time he used Dorothy's funds to his and his wife's advantage. This, they contend, is particularly true because Thomas was the chief of police, and he had a duty to protect Dorothy from dishonest persons; stated another way, Thomas's official position gave him special standing in Dorothy's eyes because she viewed him as "the law" and as an expert who could give her advice more so than other persons. One disinterested witness, Mrs. Johnson, provided testimony that Dorothy made the Doyles her heirs because she believed they would put her in a nursing home if she did not leave them a substantial legacy. Against that backdrop, the Moutons argue the trial court judgment nullification of Dorothy's 2018 and 2020 testaments because of undue influence was fully supported legally and factually.

### *Undue Influence: the law applied to the facts*

The trial court heard testimony about Dorothy, a well-to-do woman who lived with her husband in foreign countries where he worked and traveled around the world with him before his death; a woman who had no biological children but who had a good relationship with her two stepsons, Rene and Larry, during the course of some sixty years while they lived respectively in Texas and Florida, and her sister Catherine lived in Tennessee; a woman who was independent and watched her finances but who was also quite generous to family and friends; a woman who returned to live in Glenmora, her birthplace, where she had cousins; a woman who was the neighbor of the Doyles for almost twenty years where Thomas was the Chief of Police in Glenmora and his wife Donna was a school teacher; a woman who, according to a stipulation among the parties, was diagnosed with dementia in 2016 when she was in her mid-eighties; and a woman who became more and more dependent on the Doyles before she died on September 28, 2021.

When Dorothy's husband died, three accounts were established at Merrill Lynch, one for Dorothy, and a usufruct account each for Rene and Larry. Rene managed the three investment accounts. Rene testified that he and his brother Larry may not have visited Dorothy often, but they spoke to her weekly by telephone. Both Rene and Larry noticed that during 2016, Dorothy seemed to become confused and forgetful. Rene testified that in 2017, Dorothy spoke to him about aging and living alone and asked him about Louisiana law which applied to older persons. He said:

> Dorothy was always a stickler for taking care of her finances and her independence and she never wanted to be a burden to any of us like maybe her parents – her mother was a burden to her. She had a distinct fear of nursing homes. And I can remember her concern back in probably 2017, there was a lot of concern about nursing homes because she was getting older and her memory was getting worse. And there was a concern that there was a law in Louisiana that someone eighty-eight years of age could not live by theirself. So I did research on that and I talked to various people including the Merrill Lynch people asking if they ever heard of any such law. No one ever was able to find any law like that. I reported back to Dorothy that to me that was complete nonsense. That I'd never heard of such a thing. All my research had showed nothing like that. I asked her who she had heard that from and the answer I received was that from someone [who] should – that should know. So I let it slide . . . but I know she had a fear of nursing homes. And that was a major concern of hers.

In February 2017, Dorothy's sister Catherine died in Tennessee. Dorothy rode to Tennessee with Liz Mancil ("Ms. Mancil"), a member of the Catholic Church Dorothy attended. Mrs. Johnson, Dorothy's cousin, also attended Catherine's funeral and was surprised to see the Doyles there. The following is an excerpt of Mrs. Johnson's testimony, particularly as it throws light on Dorothy's relationship with the Doyles and the sponsorship Rene addressed in his testimony:

> I had gone to the funeral and I – being the next of kin to Dorothy I expected to be sitting with the family and, you know, be there right beside her but when I got there I was told to sit next to Thomas and Donna [Doyle]. . . I could't figure out why they were even there. And then after it was over, a couple of days later, I went to see Dorothy and the subject came up about this, because the priest had referred to them as her new family, or her – I guess new family the best I can remember

18

it. And Dorothy began to, to tell me how that had come about. And I learned. . .

….

Dorothy had gotten into a – some kind of an argument with Donna and in the midst of this argument Donna had told her [Dorothy] that she could be placed in a nursing home and that Thomas was just the one to do it because he was the law. And so they – she had given this some thought and it was really hanging heavy on her that, that she had to have a sponsor. That this sponsor would take care of her and that when you got to be her age you had to have a sponsor or you were placed in a nursing home. . . I was told that it was – that was – you had to have one because that's what Thomas said and Thomas was the law and he knew that that's the way it had to be done. And so she had made a deal with Thomas and Donna that if they would be her sponsor and promise not to put her in a nursing home that she would leave her house and I don't know what else but her house for sure to them in her will but they had to promise that they would never put her in a nursing home. . . . So I tried to explain to her that this sponsorship was not real. . . . And so it was, it was one of those things that you try to talk to Dorothy about it and she, she wouldn't listen because Thomas was the law and he knew.

Mrs. Johnson further related this scenario which she found unbelievable:

[I]f I came into Alexandria I would go get Kentucky Fried Chicken for Dorothy because she really like[d] chicken and I would bring it back by her house. And the first time I brought it in she started eating immediately when I got there and then she heard somebody coming upon the steps and she picked it up and she ran into the dining room to hide it. And I asked her what she was doing and she says, oh, I'm hiding it because I don't want to have to share it. . . . And . . . a couple of months later, I had brought her some chicken. She and Thomas were standing in front of the gate at her house and she walked to the car and told me to put the chicken down. Just hold it down so nobody could see it. And then the next day I stopped by to see her and she asked me not to bring her anymore food because Thomas had said if I was going to keep bringing her food that he would quit feeding her. So I quit bringing food to her. So, like I said, the situation got more uncomfortable and more uncomfortable going over there because either he was there or, . . . it wasn't like she was in control anymore.

Mrs. Johnson also testified about her temporary involvement in at least one of Dorothy's accounts at Regions Bank. In response to a question posed by counsel for the Moutons, Mrs. Johnson stated:

I took her to Regions. She put me on one of the checking accounts. Now, I don't know what this money was that was in this account. I don't know if it was from her life insurance or from her account that

she had her savings . . . But anyway, she wanted to open up an account. We opened up the account and I was supposed to take her back the next day . . . to see some investors that maybe weren't there that day and she wanted to go back and talk to the investor . . . but when I called her to ask her if she was ready to go she said, no, Thomas [Doyle] is taking me. And she had told me that Thomas didn't – she didn't want Thomas to know about this money. And I said, well, how did Thomas find out, and she said, I told him, I called him and told him. And she said, he has been involved with this from the beginning, it's not fair for him . . . not [to] be involved now. And so he took her and then I was asked to close out the account a while later because she wouldn't be able to open an account with Thomas' name on it if I had an account with . . . her at Regions. And I told her that was ridiculous. . . . I was on a lot of accounts with the museum and my personal account, my husband's account, mother's account and she says, oh, no, Thomas knows, he's the law, and we can't, we can't open up this account with him on it if you're on an account with me. So I went and closed the account up. It was, you know, Thomas was always the law, you know.

Later, Mrs. Johnson testified that Dorothy had been generous to her over the years. Dorothy gave her $10,000, supposedly from her sister Catherine's estate; $3,500 for roof repairs; and the balance[4] in the Regions Bank account.

Ms. Mancil testified that she first became acquainted with Dorothy in 2012 or 2013. They both attended the Catholic church and worked together on church fundraisers. Prior to COVID in 2020, she observed a change in Dorothy—she would ask if her clothes matched, and one time she asked Ms. Mancil how she had gotten to church even though she had driven herself there. On one occasion, she asked Dorothy about the trailer parked in her yard. When she learned that the trailer was being occupied by someone working for the city, Dorothy told Ms. Mancil that she was not worried about the stranger being there "because Thomas was chief of police and he had already checked him out."

---

[4] The amount left in the account was not firmly established. Counsel for the Doyles suggested that it was between $15,000 and $17,000; Mrs. Johnson suggested that she doubted it was $1,000. No documentary evidence was produced to support either contention.

In addition, Ms. Mancil said that Dorothy was not fond of Thomas's wife, Donna, because she was nosey.  In particular, she said Dorothy thought that Donna had gone through her house when she (Dorothy) had been hospitalized in 2016.

As to Dorothy's personality, Ms. Mancil described her as being independent and generous.  As to Dorothy's generosity, she said that Dorothy gave her a check for $5,000 when she took her to Nashville for Catherine's funeral, and she gave the church $10,000 when Dorothy's sister died.

Dorothy Jean Edwards ("Ms. Edwards"), the manager of the Glenmora Senior Center, told the court that she had known Dorothy for ten to twelve years, and they were good friends.  Ms. Edwards described Dorothy as a very giving person who on occasion gave her cash, two, three or four hundred dollars, to fix her car or when she would travel.  She said that in the years just prior to COVID, Dorothy became forgetful when she helped deliver food to the tables at the Senior Center and later stopped coming to the Senior Center.  Although the Senior Center was not open during COVID, daily weekday meals were still available for delivery, and she would deliver lunch to Dorothy at her home.  Ms. Edwards described Dorothy's house as being unkept.  In the last few years before her death, Dorothy told her she no longer wanted to live next to the Doyles because they were too controlling.

Jeffrey Botson ("Mr. Botson"), the fire chief in Glenmora, testified that he met Dorothy at the Senior Center in 2015 or 2016 and they were friends.  He last saw Dorothy a year or so before she died; at that time, Dorothy told him she had not seen him for a while because she was not allowed to leave the house.  He said that although she used to call him three or four times a week to help her, he assumed that ended when Thomas started taking care of her.

Dorothy's first cousin, Kirk Bullock ("Mr. Bullock"), told the court that he might see her every three or four months.  Pre-COVID, he found that Dorothy was

nervous, and he thought she did not want him there or did not know him anymore. When he asked Thomas about that, Thomas said that Dorothy's dementia was worsening. At that time, Thomas told Mr. Bullock that he would rather that he not come by there to visit her. Thomas also told him that he would know if Mr. Bullock came by because he had cameras everywhere.[5] At that point, he stopped visiting Dorothy. Although he was out of town on the day of Dorothy's funeral, he did not learn of her death until a week after her passing.[6]

Donna, Thomas's wife, testified that it was Dorothy who asked her husband to help her because there were bills that were not being paid. She testified that Thomas started taking care of Dorothy's financial needs in 2016. She said that Thomas and Dorothy had a debit card associated with Dorothy's Sabine Bank accounts, and he would mostly use the ATM to access money for Dorothy, especially the ten-dollar bills that Dorothy most liked to have. Donna said it was in 2016 that she started helping take care of Dorothy's personal needs. She started taking Dorothy to Dr. Slaughter, a doctor who treated her mom and dad. Before she moved into their home, the Senior Center would bring Dorothy lunch, and she and Thomas would make sure Dorothy had breakfast and supper.

Donna remembered one occasion when Dorothy asked her to promise to never put her in the nursing home. She assured Dorothy that she would do whatever was possible to make sure that never happened. Donna denied that she ever heard Dorothy say that she would give her the house only if she did not place her in the

_____

[5] In other testimony, Thomas explained that he had installed a doorbell camera which alerted him when someone came to Dorothy's door.

[6] Mr. Bullock also testified that Thomas had told him at Anna's Quickpack, a local convenience store and breakfast place, that Dorothy was his retirement fund. Mr. Bullock contended that Thomas made this statement in the presence of Tina Botson ("Ms. Botson") and Eric Stokes ("Mr. Stokes"). When questioned later about this statement, not only did Thomas deny having made such a statement, but Ms. Botson and Mr. Stokes denied having heard Thomas make such a statement. In light of that, it appears the trial court made a credibility determination and did not include this statement in its written reasons for judgment.

nursing home. She also never participated in a conversation with Dorothy about some sort of sponsorship, and she never heard her husband and Dorothy discuss sponsorship. Donna further said that Thomas did not prevent anyone from visiting or telephoning Dorothy.

Donna said that Dorothy would visit over their fence. Dorothy was fond of Mycah, the Doyles's daughter. Donna said they were close, and she considered her as her grandmother. Whenever she ran errands for Dorothy, Dorothy would give her ten-dollar bills. They took trips with Dorothy to Toledo Bend, and would spend Christmases, Thanksgiving, and Easter together. At one time, Dorothy said she finally had a family and enjoyed doing things with the Doyles.

Donna testified that in October of 2020, Dorothy would get very confused, and it was no longer safe for her to drive. In June of 2021, Dorothy became ill and had to be taken to a doctor. Because Dr. Slaughter had retired, Donna took her to Melanie Welch ("Ms. Welch"), a nurse practitioner, in Elizabeth. Because Dorothy was so weak, Ms. Welch discussed that she be placed in hospice. As a result, hospice care first visited Dorothy at her home. When Dorothy became too ill to stay at home, the Doyles moved Dorothy into their home from August 8, 2021, to September 28, 2021, the date she died.

Regarding her estate wishes, Donna said Dorothy asked several times if everything was in order so that she could be taken care of and "you can get what I want y'all to get." She had told them that the house would be left to them for Mycah's use and her car would also be theirs. About the meetings with Mr. Brame to discuss her estate planning, Donna said that she never went to any of the will signings.

After Catherine died in 2017, Dorothy asked Thomas to make an appointment with an attorney to revise her will. Thomas approached Mr. Brame, an Alexandria

23

attorney, to draft and execute the will. Thomas drove Dorothy to Mr. Brame's office on January 31, 2018, and the two of them met with Mr. Brame. At that time, Dorothy read and signed the will detailed earlier herein, and executed a power of attorney, granting Thomas the authority to make medical decisions for her. Although Mr. Brame remembered meeting Dorothy and conversing with her to find out how she wanted her assets dispersed, he could not remember more details about the execution of the will. Mr. Brame further testified that if Dorothy had told him to include a provision to disinherit the Doyles in the event she entered a nursing home, he would have regarded this as a red flag; no such discussion was had.

In the later months of 2018, Dorothy executed paperwork which removed Mrs. Johnson from various bank accounts at the Sabine Bank and substituted Thomas as a co-signatory. At the same time, Thomas testified that "[Dorothy] wanted to make sure that [he] got the money off [the] account[s]" so they were payable to him on her death; the dates of those actions are not established in the record.

Although the exact date was not identified, the record shows that in late 2018 or early 2019, Thomas saw that Dorothy had written the checks for her monthly bills and sealed the envelopes, but she had past due bills because she never mailed the payments. It was then that Thomas started writing Dorothy's checks and mailing the payments. It was also shortly thereafter that Thomas said he had Dorothy's mail sent to his address.

In connection with Thomas's involvement in Dorothy's finances, the trial court detailed the multitude of transactions in its written reasons for judgment as follows (footnotes omitted):

> [Dorothy] had three accounts that listed both [Dorothy] and Thomas Doyle: Sabine Bank account ending in 0692, Sabine Bank account ending 2011, and Regions Bank money market account ending in 4781.

24

Testimony during trial covered a lengthy review of checks and expenditures by Thomas Doyle, however only a portion of the bank records were introduced. Here are the highlights of that testimony and the documentary evidence:

- When asked about the number of ATM withdrawals from the Sabine Bank account – Thomas Doyle reported that [Dorothy] asked him to go by the ATM. He was aware that the ATM restricted withdrawals to $200 so he would have to go often. The account ending in 0692 has 22 withdrawals of $200 each from the ATM in just one month, October 2018. Thomas Doyle's explanation for such excessive use of the ATM as well as the collection of cash was that perhaps work was being done at [Dorothy's] house or that [Dorothy] was giving all the money away. He recalled nothing specific for using the ATM other than he did not like to wait in line.

- The bank statement for account ending 0692 Sabine Bank dated January 6, 2020, reflected debit card usage for Harbor Freight. Thomas Doyle testified it was for a tool to be used by [Dorothy]. The statement also reflects ATM withdrawals 14 times in a 30-day period. Thomas Doyle has no specific recollections of where those sums were used other than to say [Dorothy] asked him to get money for her.

- The bank statement for account ending 2011 for the month of January 2021 reflects Thomas Doyle withdrew cash sums in the amount of $300 each four times in December 2020 and then in January 2021 he withdrew cash in the amount of $300. In addition, in December 2021 Thomas Doyle wrote a check for $400 to himself on this account. Other payments for [Dorothy's] household expenses were performed through automatic draft and two smaller checks for the water and local volunteer fire department. Again, Doyle could not provide any detailed explanation for these expenses other than [Dorothy] asked him to do it.

- On February 27, 2020, Thomas Doyle wrote a check to Sabine Bank from the Regions account ending in 4781 in the amount of $3,000. Thomas Doyle testified that he was moving money around at the request of [Dorothy].

- The account [Dorothy] shared with Catherine Guynell Terrell also had checks written out to Thomas Doyle with the notation stating "move to other Sabine Account" in the amount of $4,000 on 7/17/20; then again on 11/23/20 for $2,000; then again on 1/16/21 for $1,200; and again on 3/22/21 in the amount of $3,500. Each check was signed by [Dorothy] but written out to Thomas Doyle. The Court was not provided with any verification of a deposit to any account of [Dorothy]. Doyle only testified that he did what he was instructed to do by [Dorothy].

- Other areas discussed however documents were not introduced.

    o Purchases at Academy for Deer lease or hunting supplies – Thomas Doyle admitted he must have gotten his debit

cards mixed up – didn't mean to spend that. No testimony that any of these sums were repaid.

- Amazon purchases – over 100 transactions with a total of $5,500 – Thomas Doyle testified that "the wife ordered" for [Dorothy]. He couldn't identify any specific purchase[.]

- $420 purchase for a senior ring through Balfour – Thomas Doyle testified it was for his daughter's boyfriend – Dawson Perkins – just something that [Dorothy] wanted to do for the young man.

- Home improvement tools totally [sic] $4,700 over a 2-to-3-year period. Thomas Doyle said in response to that expenditure – "probably so" since [Dorothy] needed those tools for the things she had done to her house.

- Trip to Washington, D.C. going through Georgia, Tennessee, and Virginia – Thomas Doyle said "I do not think I did" when asked did he make a call to the bank to note the card would be used as they traveled. [Dorothy] was not on this trip.

- Zulily charges – Thomas Doyle was not certain of this one – maybe his wife did that charge[.]

- Health club charges – Thomas Doyle had not been in a health club nor did [Dorothy].

- When asked about the total of $60,700 withdrawn over a period of 3 years – Thomas Doyle stated that "it wouldn't surprise me" . . ."she gave away a lot of money to a lot of people". Thomas Doyle stated that [Dorothy] talked about giving money to Claudia [Johnson] because her husband may kick her out.

- When asked about the total of $46,000 plus that was withdrawn via written withdrawal forms from inside the bank and then $46,191 withdrawn through the ATM – Thomas Doyle's response was that "sounds like I was moving money to different accounts."

- The Debit card reflected 372 transactions with 270 ATM events, 93 withdrawals and 107 checks – Thomas Doyle did not dispute those events.

- Regions Bank Money Market account ending in 4781 reflects that

- In August 2019 - $26,100 withdrawn by Thomas Doyle, alone
- In September 2019 - $10,000 withdrawn by Thomas Doyle, alone
- In October 2019- $9,500 withdrawn once by Thomas Doyle ($4,500) alone and then one time by [Dorothy] ($5,000) alone
- In November 2019 - $6,000 withdrawn by Thomas Doyle alone
- In December 2019 - $7,000 withdrawn by Thomas Doyle alone, and then [Dorothy] wrote a check on the account in the amount of $10,000, the last check or withdrawal actually signed by [Dorothy]
- In 2020 the account had 11 withdrawals all by Thomas Doyle totaling $68,607.57 with several having curious notations of "stock" "ameritrade" "corona" "payment of bills" "transfer to Sabine"
- In 2021 just two withdrawals by Thomas Doyle alone totaling $12,000 both of which noted a transfer to a Sabine account.
- Total of 720 transactions in 2018/2019 with a total expenditure of $185,600 which Thomas Doyle reports always involved [Dorothy].
- Generators – one purchased for the Doyles' home and one for [Dorothy's]
- Thomas Doyle did admit that [Dorothy] did give him, his wife and his daughter cash but does not think it was that much.
- Hunting Lease – Thomas Doyle reported he paid those cost [sic] himself.
- Installation of cameras – Thomas Doyle did have the cameras installed at the expense of [Dorothy].  Did so to aid [Dorothy] in seeking help from Doyle if she needed him using the Ring Ding camera system.
- Cargo Trailer and shed – cargo trailer 1st placed on the property so that Dawson Perkins a high school senior, Doyle's minor daughter's boyfriend, could stay.  Then supposedly [Dorothy] said the young man could not live in that, so she requested Doyle to buy a shed and get it furnished to serve as a home for Dawson in her back yard.
- Bicycle for Dawson – again Thomas Doyle reported that [Dorothy] asked Thomas to purchase the bicycle when Dawson got a job with the Town of Glenmora
- Truck from Vaughn Chevrolet – Thomas Doyle reported that [Dorothy] gave him the

money to pay for a truck since he had been helping her.

- Gifts or Tithes to her church – Thomas Doyle testified that he delivered cash of $10,000 to the local priest and said [Dorothy] made that request of him. Testimony revealed that there was a check written by [Dorothy] to her church in that same amount. The check was not introduced.

On February 1, 2021, Rene found out from their Merrill Lynch broker in Lake Charles that Thomas had been added to Dorothy's checking account. At that time, he learned that Merrill Lynch had received a check written and signed by Thomas on one of Dorothy's bank accounts. Rene found that this was out of line for Dorothy to have a non-family member on the account. When he called his brother, Larry, it was confirmed that Thomas was Dorothy's neighbor.

After Dorothy did not answer phone calls from Rene and Larry to discuss this new information, they visited her on March 3, 2021. At that visit, they learned that Dorothy had not been looking at her bank statements. The stepsons then discussed Thomas being on her accounts and proposed if they, instead of Thomas, could be added to those accounts only to monitor them. Although Dorothy opposed it at first, they suggested to be added to the accounts, and they offered to pay Thomas and his wife to take care of Dorothy. When they approached Thomas with this proposal, he refused. After visiting the cemetery with her stepsons, Dorothy agreed to their proposal, and it was agreed that they would meet the next day at Sabine Bank to make the change. That night they received a call from Dorothy, saying she wanted to leave things as they were.

Because he was already on one of Dorothy's checking accounts at Sabine Bank, Rene was given a password and internet access to the account. He found five or six checks written and signed by Thomas since July of the prior year. These checks were written to Thomas with a memo stating, "moved to other Sabine account."

Apprehensive about the state of Dorothy's finances, Rene reported these concerns on March 24, 2021, to the Louisiana Governor's Office of Elderly Affairs ("OEA") and asked the agency to investigate. On September 9, 2021, just prior to Dorothy's death, the OEA wrote its analysis of its findings after interviewing Dorothy and Thomas and reviewing some of Dorothy's bank statements. It concluded that Dorothy was "able to communicate and make her needs known but she does repeat herself and suffers with memory loss." It also noted that Dorothy was at the home of the Doyles, that she could not remember Doyle's first name and thought a nurse from the Senior Center brought her daily lunch. In conclusion, the OEA report stated the outcome of its investigation as follows:

> Unsubstantiated with concerns. The client [Dorothy] is unable to verify any information relating to her finances and asked that Specialist speak with [the] accused [Thomas] because he takes care of all her business. The accused is unable to verify some information relating to the clients (sic) finances because the client makes her own decisions about what she wants to do with her money, and he assists her by obtaining the money for the client. Mr. Doyle was educated on the importance of maintaining records in regard to the clients (sic) finances and agreed to participate as suggested.

In its written reasons for judgment, the trial court drew together the various witness testimonies and stated:

> A review of the evidence paints a picture of a woman who trusted a neighbor when family members were not readily available to her as she declined in physical and mental health. [Dorothy] put forth an image of an independent woman, yet the more that was revealed in trial, she was not in full control of her life or her finances. [Dorothy] from all accounts was not a southern [genteel] ,woman but perhaps more direct or even some would say rude. She spoke her mind which created distance with her family members at some points and then later get reconnected. The change in [Dorothy] was dementia, which records reflect came finally in 2016.

> Throughout the many years of being neighbors, Thomas Doyle continued to do common neighborly chores or exchanges – mowing the grass, sharing of a meal, and making small talk. Yet as the years go by, it is Thomas Doyle that notices the late notice sent in the mail and then slowly begins the process of getting more and more into [Dorothy's] financial business. Thomas and Donna Doyle become uniquely aware

of the frequent memory lapses of [Dorothy]. As Thomas Doyle gets his name placed on more of [Dorothy's] accounts, money is expended with little detail given by Thomas Doyle of why such large sums were removed. Thomas Doyle's self-serving testimony is all that is presented in court with little support of receipts or witnesses to verify why [Dorothy] would have need for such continual large sums of cash. The Court does not find Thomas Doyle to be a credible witness.

A review by the Court of the documents introduced[] finds that by the time the February 18, 2020, will was executed, Thomas Doyle, in his name alone, had withdrawn $66,100 from the money market account along with untold numbers of ATM withdrawals and checks written on the Sabine and Region bank accounts. Thomas Doyle reported that [Dorothy] allowed him to spend her money and claimed he asked every time before making a withdrawal. The Court notes that Thomas Doyle would be fully aware that [Dorothy] would forget or that she would even know that he was spending money. By Thomas Doyle's own testimony, she forgot to mail her bills such that she received a cut-off notice.

While Thomas Doyle was making these withdrawals, family and friends were expressing concerns. Various statements made by [Dorothy] to family and friends were upsetting and curious such as questions regarding a need for a sponsor to prevent placement in a nursing home; or that 88-year-olds were not allowed to live alone. [Dorothy] would have been asking this question when she was 87 or 88 which would have been in 2016 (the year stipulated to of her diagnosis of dementia) or in 2017 (the year she turned 88). Then eventually the change in the accounts traditionally monitored by her stepson became a red flag for the Merrill Lynch account executive such that he made a call.

[Dorothy's] decision-making abilities raised concern as well. For example, when family members explored with [Dorothy] why a high school student, (who was the Doyle's daughter's boyfriend), was living in her yard in a cargo trailer and then later why [Dorothy] would expend untold sums on making the shed into a home for that same high school kid, [Dorothy] would report that Thomas Doyle asked for it. Church friends noticed a decline in her ability to dress appropriately, and her friend who delivered food daily was aware of the loss of memory such that she no longer returned to the senior citizen center. [Dorothy's] sister dies in 2017 and she loses a trusted friend, a lifelong companion[,] and she is worried about what the future may hold.

In the middle of the circumstances listed above, the Doyles assist [Dorothy] in locating an attorney to develop a new will in 2018, the year also of their child's high school graduation. By this time, [Dorothy] had already been asking questions about sponsorship and the Doyles have been spending large sums of money for themselves and funds were used to assist their daughter's boyfriend.

The timing continues to be curious when the 2018 will changed to reflect the removal of Liz Mancil. The 2018 will left all of [Dorothy]'s furnishings to Mancil and in all other respects the will remained the same. The difference[,] however[,] in those intervening years is the drain on the accounts of [Dorothy]. [Dorothy]'s sister died in 2017 and left [Dorothy] with significant sums of cash with one estimate being $350,000 for the sale of a house and an additional $100,000 in cash. By February 18, 2020, it appears from the testimony that [Dorothy] no longer attended mass on a regular basis and began to go less and less to the senior citizen center due to her own physical and mental limitations along with COVID-19 restrictions. Family members were not daily visitors or callers. Isolation was the result, with [Dorothy] becoming increasingly dependent on the Doyles[] for food (breakfast and supper each day) and human contact.

[Dorothy] commented to her cousin, Claudia Johnson, what a mess her life had become, and she later commented to Edwards that she was afraid of the Doyles. [Dorothy] continued to express her concern over being placed in a nursing [home] and mentioned the promises made by the Doyles that they would make sure that would not happen.

Of concern to the Court is what little knowledge the attorney for [Dorothy] had available. The Doyles certainly did not share with Scott Brame that Thomas Doyle had been writing checks on multiple accounts and that the Doyles used [Dorothy]'s debit cards. The Doyles were with [Dorothy] on each attorney visit and [Dorothy] did not ask that the Doyles remain out of the conversation.

In addition to what information the Doyles did not share with the attorney, the Doyles did not keep a running total of the expenditures out of [Dorothy]'s accounts. Thomas Doyle was even flippant in his testimony that oh, he must have gotten her card confused with his with no comment if and how he would pay it back. No evidence was produced by the Doyles that they even attempted to keep track of all the money flowing for their benefit, their child's benefits, or their child's boyfriend's benefit. In all other instances of [Dorothy]'s giving, the generosity of [Dorothy] was reasonable and in-line with what her giving pattern may have been. She would selectively spoil some individuals, but none experienced the constant flow of money the Doyles received as has been observed by this Court with what limited documentation was placed into evidence.

[Dorothy] had a will executed in 1996 which left bequests to her sister and then her stepsons. That testament remained the only document for [Dorothy] until the Doyles entered her life and arranged for [Dorothy] to see an attorney.

No evidence was introduced that the [Moutons] are needing or wanting money from [Dorothy]. Their motive of involvement came only after they became aware of the financial exploitation. They inherited from their father and [Dorothy] named them as equals in the

1996 will but then in 2018 and 2020, the will changed leaving the stepsons only the Merrill Lynch and Whitney Bank accounts. All other items – home, car, movables, and two accounts at Sabine Bank – were designated for the Doyles.

The guidance given by the comments in Civil Code Article 1479 that subtle influences may constitute undue influence is certainly the case presented by the [Moutons] especially those suggestive of creating resentment.

Like the decedent in *Succession of Davisson,* [La.App. 2 Cir. 12/22/16), 211 So.3d 597,] the most compelling evidence of undue influence is the financial control over [Dorothy] and the conversations concerning her fear of going into a nursing home and the need for a sponsorship. [Dorothy] relied exclusively on Thomas and Donna Doyle for transportation, breakfast, and dinner each day, companionship, and household chores. Even as she was in her last days on this earth when hospice was providing care, she questioned whether there [was] enough money to keep her out of the nursing home. [Dorothy] was not fully aware of her financial situation, and she became increasingly reliant upon the Doyles for friendship, security, and help with managing her bills. The Doyles used this dependency to their advantage by meticulously draining her of assets and promising her that they would be the ones to keep her out of the nursing home, suggesting that others would not treat her the same. The undue influence used by the Doyles was the kind of influence that destroyed [Dorothy]'s free agency, her independence that so many testified she had known before her dementia and failing health. The relationships she had with her family members – the [Moutons], her cousins, and her friends – were removed leaving her wholly reliant upon the Doyles. The limited times that [Dorothy] would even comment to family or friends about the Doyles she shared concerning information about the need for sponsorships and the inability of an 88-year-old to live alone. When the [Moutons] visited [Dorothy] in her home in an effort to get back on accounts as monitors, and again renew their commitment to assist her, it was Doyle that intercepted their efforts.

The record is clear that [Dorothy] had a diagnosis of dementia in 2016, by 2018 Thomas and Donna Doyle became aware of [Dorothy]'s limitations due to dementia and had Thomas Doyle's name placed on accounts, and thereafter checks and withdrawals began for the Doyles' financial gain. While using [Dorothy]'s money the Doyles used their knowledge of her dementia and fears to influence [Dorothy] in making changes for her last will and testament.

Based upon these reasons, the Court finds the record is replete with testimonial and documentary evidence illustrating the Doyles' undue influence over Dorothy . . . beginning as early as 2017 and well past the execution of the 2020 last will and testament by a preponderance of the evidence (and beyond) such that the 2018 and

2020 last wills and testaments are invalidated as a product of undue influence.

After thoroughly reviewing the record, we find no error in the trial court's finding that the 2018 and 2020 last wills and testaments of Dorothy should be invalidated as a product of undue influence on the part of the Doyles.

**THE MOUTONS' ANSWER TO THE APPEAL**

**THE MOUTONS' ARGUMENT**

The Moutons point out that in their petition they sought that a rule be issued directing the Doyles to show cause why the "bank accounts that were signed over to THOMAS R. DOYLE and DONNA R. DOYLE should not be . . . ordered to be restored to their previous balances prior to when MS. MOUTON assigned[7] the bank accounts to THOMAS R. DOYLE and DONNA R. DOYLE." They assert in their answer to the appeal that the trial court erred in failing to enter judgment requiring the Doyles to return funds taken by them from Dorothy's bank accounts prior to her death. They contend that even though the evidence adduced at the hearing showed that the Doyles initiated seven hundred twenty transactions on Dorothy's bank accounts which resulted in the transfer of funds totaling $185,600 to them, the trial court's judgment is silent on this issue. Instead, because the Moutons feel the trial court judgment is ambiguous, they ask that there be judgment requiring the Doyles to restore Dorothy's bank accounts and to refund all funds withdrawn by them from those accounts at any time prior to her death; and that there be judgment against the Doyles in the amount of $185,600 plus interest.

---

[7] "Assigns means those to whom rights have been transmitted by particular title; such as sale, donation, legacy, transfer or cession." La.Civ.Code art. 3506(5).

## THE DOYLES'S POSITION

The Doyles contend that the Moutons' claims raised in their answer to the appeal should be denied. They argue that the testimony clearly showed that Dorothy gifted large sums of money to friends, family, and neighbors over the latter part of her life. Therefore, they contend that it would be a great injustice to the Doyles to require them to account for these sums that Dorothy gifted just because Thomas assisted her with the payment of her bills.

## LAW AND ANALYSIS

To better place this issue into perspective, we note that the trial court's initial written reasons for judgment did not address the question of whether reimbursement was due by the Doyles, an item urged in the Moutons' petition. However, in an addendum to the written reasons, the trial court noted that after circulating the initial written reasons, it received a letter from counsel for the Moutons[8] requesting clarification. It was then that the trial court stated in its addendum to its earlier written reasons that it granted the request to freeze the assets of Dorothy's estate until a complete administration is finalized and further granted the request that the bank accounts signed over to the Doyles should be restored to their previous balances prior to Dorothy's death.[9] This latter finding was ultimately memorialized in the trial court's judgment of October 13, 2022, as follows: "IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that any and all bank accounts that had been signed over to Thomas Doyle and/or Donna Doyle should be restored to their previous balances prior to the death of Dorothy Terrell Mouton."

---

[8] This letter does not appear in the appellate record. It is not known, too, what the letter contained and whether this letter was shared with the Doyles.

[9] In a related matter, the trial court also denied the Doyles's request to be named co-independent testamentary executors.

Without addressing the litigants' arguments, we find it necessary to first determine whether the Moutons have a right of action to recover estate assets.

The peremptory exception of no right of action derives from La.Code Civ.P. art. 927. The exception of no right of action tests whether the particular plaintiff falls, as a matter of law, within the particular class to which the law grants a remedy for the particular harm alleged. *Ridgedell v. Succession of Kuyrkendall*, 98–1224 (La.App. 1 Cir. 5/19/99), 740 So.2d 173. The exception relates specifically to the person of the plaintiff, questioning whether the plaintiff falls within the class of persons who have the legal interest and legal capacity to bring the cause of action asserted. *In re Ewing*, 34,413 (La.App. 2 Cir. 3/2/01), 781 So.2d 885. "The essential function of this exception is to provide a threshold device which terminates suits brought by one who has no interest in enforcing judicially the right asserted." *Id.* at 889.

A defendant may plead the exception of no right of action in any court prior to the submission of the case for decision if proof of the ground for the exception appears in the record. La.Code Civ.P. arts. 928; *Mouton v. Dep't of Wildlife and Fisheries for the State of Louisiana*, 95–101 (La.App. 1 Cir. 6/23/95), 657 So.2d 622, *writs denied*, 95–2161 and 95–2164 (La.11/17/95), 663 So.2d 710, 711. The trial or appellate court may also notice the objection of no right of action on its own motion. La.Code Civ.P. art. 927(B).

"Whether a plaintiff has a right of action is a question of law." *Horrell v. Horrell*, 99-1093, p. 5 (La.App. 1 Cir. 10/6/00), 808 So.2d 363, 368, *writ denied*, 01-2546 (La. 12/7/01), 803 So.2d 971.

Louisiana Code of Civil Procedure Article 685 states as follows:

> Except as otherwise provided by law, the succession representative appointed by a court of this state is the proper plaintiff to sue to enforce a right of the deceased or of his succession, while the

35

latter is under administration. The heirs or legatees of the deceased, whether present or represented in the state or not, need not be joined as parties, whether the action is personal, real, or mixed.

Additionally, Article 3211 of the Louisiana Code of Civil Procedure states, in part, that the succession representative "shall be deemed to have possession of all property of the succession and shall enforce all obligations in its favor." "Neither of these articles provides for or establishes the right of an heir or legatee to enforce any rights of the succession while the succession is under administration and there are no other provisions of Louisiana law providing for such right." *Jackson v. Lopez*, 524 So.2d 769, 771 (La.App. 3 Cir.) *writ denied*, 525 So.2d 1044 (La.1988); *see also Dhaliwal v. Dhaliwal*, 54,502, 54,503, 54,504 (La.App. 2 Cir. 6/15/22), 342 So.3d 402.

To the contrary, La.Code Civ.P. art. 3191 defines the succession representative as a fiduciary with respect to the succession, who has the duty to collect, preserve and manage the property of the succession. As a corollary, "[i]n the performance of his duties, a succession representative may exercise all procedural rights available to a litigant." La.Code Civ.P. art. 3196.

Against that backdrop, our brethren of the second circuit stated:

> We feel the lawmakers have made it abundantly clear . . . that while a succession is under administration the administrator is the sole person authorized to enforce the collection of any debt alleged to be due the succession. This leads to an orderly administration of the estate and prevents a multiplicity of suits which could result if individual heirs were allowed to prosecute claims on behalf of such estate.

*Browne v. Witten*, 153 So.2d 184, 186 (La.App. 2 Cir. 1963).

In the present case, when the Moutons filed suit against the Doyles on December 30, 2021, they did it as testamentary legatees, not executors, of Dorothy's succession. Although Dorothy's 1996 will named "Rene Paul Mouton, Jr. and Catherine G. Terrell, or the survivor of them, as co-executors" of her succession, it was not until September 19, 2022, after the trial court had found Dorothy's 2018 and 2020 wills invalid, that the Moutons petitioned the court to probate Dorothy's 1996

will. In that filing, the Moutons sought to be named as independent executors of her succession, "working separately or in conjunction with one another, without bond, and to have Letters of Independent Executorship issued to them." On October 13, 2022, the trial court signed an order appointing the Moutons as independent executors "and that Letters of Executorship be issued to them; and that they be recognized hereby as having all the rights, powers, authorities, privileges and duties of succession representative as are otherwise provided by law[.]"

Considering the applicable law and jurisprudence, the Moutons, as legatees, did not have a right of action to have the bank accounts that Dorothy signed over to the Doyles restored to their previous balances prior to her death. Accordingly, on our own motion we recognize that the Moutons have no right of action to seek such redress—that right of action belongs solely to the succession representative. Therefore, we find the Moutons have no right of action to pursue their answer to this appeal[10] and further reverse that portion of the trial court judgment which provided for the restoration of balances in those accounts Dorothy signed over to the Doyles.

## DECREE

For the foregoing reasons, we grant the Doyles's motion to strike language in the Moutons' brief about information outside the record. We affirm the trial court judgment as it nullified the 2018 and 2020 statutory wills executed by Dorothy Terrell Mouton. We further find that Rene Paul Mouton, Jr., and Lawrence Keith Mouton have no right of action as legatees to have the bank accounts that Dorothy Mouton signed over to the Doyles restored to their previous balances prior to her death. Accordingly, we reverse that part of the trial court judgment which ordered Thomas Doyle and/or Donna Doyle to restore all of Dorothy Terrel Mouton's bank

---

[10] We are cognizant that La.Code Civ.P. art. 934 allows for the amendment of the petition when the objection can be removed. However, in the present case that remedy is unavailable because the Moutons' appearance in their petition is as legatees, not succession representatives.

accounts to their previous balances prior to her death and remand this matter for further proceedings. The costs of this appeal are assessed one-half to the Moutons and one-half to the Doyles.

**MOTION TO STRIKE GRANTED; JUDGMENT AFFIRMED, IN PART; PEREMPTORY EXCEPTION OF NO RIGHT OF ACTION ENTERED, AND THE JUDGMENT IS REVERSED, IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS.**